**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 05-52-DLB**

**EDWARD C. LUCAS**                                                                              **PLAINTIFF**


**vs.**                              **MEMORANDUM OPINION AND ORDER**


**CITY OF LUDLOW, KENTUCKY, ET AL.**                                      **DEFENDANTS**

* * * * * * * * * * * * * *

## I.      Introduction

This case involves a civil rights action under 42 U.S.C. § 1983.  It arises out of the alleged unlawful actions of certain Ludlow, Kentucky, police officers and school officials in investigating, arresting, and prosecuting Plaintiff on vote buying and terroristic threatening charges.  Plaintiff sues the City of Ludlow, Police Chief Ray Murphy, Police Officers Benny Johnson and James Tucker, Building and Zoning Administrator Joe Schutzman, the Ludlow Independent Schools, and former Ludlow Superintendent Elizabeth Grause for alleged unlawful actions he claims were taken against him in retaliation for his opposition to a proposed tax levy to support the Ludlow Independent Schools.  Each Defendant is sued in both their individual and official capacities.

Plaintiff's Amended Complaint asserts causes of action pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights under the First, Fourth, Eighth and Fourteenth Amendments.  Plaintiff also brings an action pursuant to 42 U.S.C. § 1985(3) alleging that the Defendants conspired with one another to deprive him of his right under

the First Amendment to protest the school tax.  Finally, Plaintiff asserts causes of action under Kentucky state law for malicious prosecution and defamation.

This case is before the Court on Motions for Summary Judgment filed on behalf of Defendants City of Ludlow, Murphy, Johnson, Tucker, and Schutzman (Doc. # 61) and on behalf of Defendants Ludlow Independent Schools and former School Superintendent Grause (Doc. # 63).  Plaintiff having filed a joint response to both motions (Doc. # 71), and Defendants having submitted their respective replies (Docs. # 74 and 75), the motions are ripe for the Court's review.  For the reasons that follow, the motions will be **granted**.

## II.    Factual and Procedural Background

Plaintiff, Edward C. Lucas, is a resident of Ludlow, Kentucky, who resides at 854 Oak Street.  During the time frame encompassing Plaintiff's allegations in this case, it is undisputed that Plaintiff had a strained relationship with some of his neighbors, including Mike and Sharon Rice, who rented the property at 856 Oak Street, and Frances and Nicholas Gross, who owned that property.

As a result of their encounters with Plaintiff, many of his neighbors on Oak Street have felt harassed, intimidated and threatened by him.  For example, while attempting to rent 856 Oak Street, the Grosses reported to police that a tenant had declined to renew her lease because she was afraid of Plaintiff.  The Grosses further reported trying to sell the property in September 2002 without success because Plaintiff had repeatedly called their real estate agent to speak derogatorily about the property and interfered with property showings.  According to the Grosses, Plaintiff admitted he had intentionally ran everyone off, called Mrs. Gross dirty names, and referred to her as trash.

In December, 2003, Plaintiff complained to Police Chief Murphy that his neighbor at 852 Oak Street was creating a nuisance due to rodents on their property, which were in turn, migrating onto his property. According to Plaintiff, Chief Murphy laughed at him when he complained. Despite this alleged cavalier attitude, Plaintiff's complaint was forwarded to Building and Zoning Inspector Joe Schutzman who conducted an investigation. Schutzman's investigation included an inspection of the property in January, 2004 and a meeting with Plaintiff and the mayor. The inspection revealed no violations. Over the course of more than a year, Plaintiff continued to lodge several complaints with Schutzman, who inspected the neighbors' property multiple times and found no evidence of rats or of anything on the property that would attract rats. Despite Schutzman's efforts to investigate Plaintiff's concerns, Plaintiff advised the neighbors he intended to place rat poison on their property, that the rat poison would also kill the neighbors pets and that he would not be responsible for anything that may happen to their dogs.

In March 2004, voters in the Ludlow Independent School District were considering a property tax levy. Plaintiff vehemently opposed, and was a visible, outspoken critic of the proposed tax increase. The vote was scheduled for March 30, 2004.[1] On March 13, 2004, Plaintiff participated in an impromptu meeting where the topic of the proposed tax levy was discussed with some of his neighbors and their relatives. During that discussion, which included Plaintiff's neighbor Rick Fox; Fox's 18-year old daughter, Dyana Fox; Dyana's boyfriend; and Ludlow High School Senior Tim Grogan, it became apparent that Grogan was the only person who intended to vote for the tax. Although Plaintiff intended it as a

---

[1] The Court takes judicial notice that the proposed tax levy failed. Ms. Grause recalls that the vote was approximately 3 to 2 against the tax levy.

joke, Plaintiff told Grogan that if he voted for the tax, he'd flatten his bald tire on his car and egg his house. Plaintiff also offered to buy Grogan a 12-pack of beer if he voted against the school tax levy.

During that same time period, Grause was visiting businesses throughout Ludlow asking them to display signs supporting the tax levy. On March 19, 2004, Grause observed that several of the signs that business owners had agreed to place in their windows had been taken down after being on display for just a few minutes. Upon learning this, Grause returned to one of the businesses, the Little Corner Kitchen, and asked the owner why the sign had been removed. The owner told Grause a man had come in, told her she would lose business and be the subject of a boycott if she continued to display the sign, gave her three dollars and removed the sign. According to Plaintiff, he did not intend the gesture as a bribe. Grause reported the incident to the Ludlow Police Department.

Ms. Grause also observed Plaintiff leaving the Ludlow Ameristop with one of the signs and confronted him about it, while another person called the Ludlow Police Department. Two police officers who are not parties to this action responded. According to Plaintiff, he was detained at Ameristop by Ms. Grause until the police arrived. The officers interviewed the clerk at the Ameristop who advised that Plaintiff had come in and told him that a lot of people would be upset if he left the signs up and might not come in the store. Although Plaintiff claims he had the permission of the owner to remove the signs, according to the store clerk, Plaintiff did not have permission. The Ameristop clerk told Plaintiff he would consider removing the signs, but Plaintiff took the signs with him when he left the store.

4

Upon speaking with the officers, Plaintiff requested to speak with Chief Murphy about the sign incident.  Plaintiff thereafter drove himself to the police station to discuss the incident with Chief Murphy.  Grause did not accompany Plaintiff to the police station.  Chief Murphy told Plaintiff not to take any more signs down before allowing Plaintiff to leave.

On March 22, 2004, Grause received an e-mail from a teacher in the School District alerting her to Plaintiff's conversation with Grogan and the offer to buy his vote.  After receiving the e-mail, which also referred to the sign incident, Grause forwarded it to Defendant James Tucker, who was serving as the School District's resource officer.  Tucker thereafter investigated the incident, which included interviewing the Ameristop clerk.  According to the clerk, Plaintiff came into the store, threatened a boycott if Ameristop continued to display the sign, and insisted on taking the sign down himself.  The clerk told Tucker that Plaintiff was so insistent that he finally just let him take it, figuring that it was not worth the argument.  Tucker's investigation also included interviewing other local business owners, including Blaine Lawrence, who told Tucker the following:

> Plaintiff came into his store about ten minutes after the sign went up. According to Lawrence, Plaintiff said people would not come in his store with the sign in the window and that he would give Lawrence three dollars to remove the sign, which Lawrence perceived as bribe money.  Lawrence told Plaintiff he did not want any money and that he did not think Plaintiff should take the sign with him since Plaintiff had not been the one to put the sign in the window.  Plaintiff took the sign anyway, leaving three dollars on the counter as he left.

Although Plaintiff does not deny that he left the money on the counter, he insists it was not meant as a bribe.

As part of Tucker's investigation into Plaintiff's offer to purchase beer for Grogan if he voted against the tax, written statements were obtained from Grogan, Dyana Fox and

Rick Fox.  According to those statements, Grogan, Dyana Fox and Fox's boyfriend were sitting on the porch at the Fox residence when Plaintiff approached and interrupted their conversation to discuss the tax levy and to hand them a flyer opposing it.  When Grogan indicated he might support the tax, Plaintiff said he would buy Grogan a twelve-pack of beer if Grogan voted no on the tax.  When Grogan questioned whether Plaintiff was serious, Plaintiff repeated the promise.  As Grogan walked away to his car, Plaintiff told him that he would know how Grogan voted because he had spies in the voting booth.  Plaintiff also told him that if he voted no he would get a 12-pack, but if he voted yes, his house would get egged and his bald tire slashed.  Plaintiff does not deny making those statement, but insists that he was just joking.

Officer Tucker also attempted to interview Plaintiff about the vote-buying allegations.  As part of the investigation, Tucker visited Plaintiff's home and knocked on the door.  Receiving no response, Tucker left.  Upon returning home, an elderly neighbor and a contractor informed Plaintiff that a heavyset man with a long beard had been knocking on his door.[2]  Based on this description, Plaintiff knew immediately that Officer Tucker was looking for him.  Plaintiff called the Ludlow Police station, obtained Tucker's cell phone number, and called Tucker.[3]  During their conversation, which Plaintiff described as hostile, Tucker told Plaintiff he was investigating a statement about alleged vote buying by Plaintiff on the school tax levy.  Plaintiff testified that Tucker told him that he needed to keep his

---

[2]  According to Plaintiff, Tucker burned up his door bell by ringing it so many times in an attempt to interview him.

[3]  Plaintiff believes the conversation with Officer Tucker occurred on either March 14 or 15, rather than March 22 as recalled by Tucker.  Based on the date of the e-mail from Ms. Grause to Tucker, dated March 22, 2004, the latter date is more likely.  However, this factual dispute is irrelevant for purposes of adjudicating Defendants' pending motions.

mouth shut and watch what he does.  According to Tucker, Plaintiff asked Tucker if he knew how much money he had and told Tucker to tell Kenton County Attorney Garry Edmondson that he doesn't know who he is fooling with.  The conversation ended with Plaintiff telling Tucker to "go to hell" and summarily ending the call by hanging up on Tucker.

During his March 25, 2004, interview of Dyana Fox, Officer Tucker was advised that during the March 13, 2004 conversation, Plaintiff said that whomever votes in favor of the tax would have their tires slashed, their windows busted, and their house egged.  Fox further advised that a few days later Plaintiff came back to Fox's house and told her that he had given five people money to vote no on the tax.

Based on the statements he obtained and his investigation, on March 26, 2004, Officer Tucker applied for an arrest warrant from Kenton County District Judge Douglas Grothaus.  Judge Grothaus reviewed Tucker's affidavit and found probable cause to issue the warrant for an alleged violation of K.R.S. § 119.205, a Class D felony, which makes it a crime to make or receive expenditures for a vote.  Plaintiff was arrested pursuant to the warrant later that same afternoon by Ludlow Police Officer Gilberson.  Although Officer Johnson was present when Plaintiff was arrested, Plaintiff alleges no impropriety by Johnson stemming from his arrest.  It is undisputed that a grand jury subsequently chose not to indict Plaintiff on the alleged vote buying charge.

Discovery has revealed that the disagreements between Plaintiff and his neighbors continued throughout 2004, ultimately culminating in the events of July, 2004.[4]  According

---

[4] During a 42 month period between March, 2001 and December, 2004, the Ludlow Police Department responded to roughly 40 calls at or about Plaintiff's residence, approximately one per

to Plaintiff, his neighbors were the instigators of many of the incidents which included the Rices throwing debris into his lawn and rocks onto his porch, and using anti-gay slurs at Plaintiff and his partner Leonard Bickers.  On one occasion on June 26, 2004, Plaintiff was allegedly threatened by the Rices with a baseball bat.  Plaintiff generally avers that other than speaking to the Rices, the police did nothing to protect him from these alleged threats.

On July 22, 2004, Mrs. Rice reported to Ludlow Police that, following a fencing dispute with Plaintiff on July 20, Plaintiff walked over to his truck and pulled out an object. According to Mrs. Rice, although the item in Plaintiff's hand was obscured from view, Plaintiff intimated it was a gun and said he had a box of bullets to go with it.  Virginia Padgett[5], Mrs. Rice's sister, told Ludlow Police that she observed Plaintiff carrying a gun on the evening of July 20.  Knowing that Plaintiff and his roommate were both convicted felons and that neither was lawfully permitted to possess a gun, Ms. Padgett relayed that information to the Ludlow Police Department.

After confirming Plaintiff's status as a convicted felon by running Plaintiff's name through the NCIC database[6], written statements were obtained from Mrs. Rice and Mrs. Padgett who had reported that Plaintiff had a weapon in his possession.  Officer Benny Johnson applied for and obtained a state search warrant for Plaintiff's residence and vehicles for weapons.  The search warrant was executed on July 23, 2004.  Upon arriving at the residence, officers knocked and announced their presence.  Receiving no response,

_____

month.

[5] As was the case with the Rices, Plaintiff originally named Mrs. Padgett as a defendant, but subsequently dismissed her.

[6] It is uncontested that Plaintiff has been convicted of felony misuse of a credit card and unlawfully receiving unemployment benefits.

several attempts were made to kick in the door.[7]  Plaintiff eventually opened the door and the officers proceeded to execute the search warrant.  The officers on the scene included Officers Johnson, Giberson, Roberts, and two deputies from the Kenton County Sheriff's office.

It is undisputed that Plaintiff was not happy that a warrant had been obtained to search his residence and vehicles.  Both Plaintiff and Mr. Bickers threatened to sue Officer Johnson and the City of Ludlow while the warrant was being executed.  Because the officers were unsure whether the warrant covered Mr. Bickers' basement living quarters, Officer Johnson called the Commonwealth Attorney's office to verify whether the warrant covered that area as well.  Upon being advised that the warrant covered the basement as well, the officers proceeded to search Bickers' living quarters.

It is further undisputed that during the search, words were exchanged between Officer Johnson and Plaintiff.  Plaintiff admittedly told Johnson that he knew where he lived, that he really screwed up this time, and that he threatened to set Johnson up, plant drugs in his house and on his daughters or their vehicles, telling Johnson not to be surprised if they find drugs in their car.  As with the comments to Tim Grogan in March, Plaintiff claims that he was just joking.  Plaintiff also told Johnson he had a videotape of Johnson burning someone's garage down and threatened to use the tape against Johnson.  Mr. Bickers also testified regarding the existence of the same tape.  However, discovery has produced no videotape and Mr. Bickers refused to answer specific questions regarding the tape during

---

[7]  Contrary to the narratives of Ludlow Police Officers William Giberson and Fred Roberts, attached to Plaintiff's response to the motions for summary judgment at attachment pages 42 and 43 respectively, Plaintiff contends that the officers kicked the door in without any exigent circumstances.

his deposition.  Several officers on the scene also overheard Plaintiff telling an individual on the his cell phone that Officer Johnson was pointing a gun at him during the execution of the search warrant.  Once again, Plaintiff claims he was just joking.  However, those same officers, as well as Mr. Bickers, did not see Johnson point his weapon at Plaintiff.  For his part, during the execution of the search warrant, Officer Johnson told Plaintiff that he didn't like "faggots" living in Ludlow.  According to Plaintiff and Mr. Bickers, that wasn't the first time Johnson or other Ludlow officers had used anti-gay epithets against them.  It is undisputed that no firearms were found during execution of the search warrant.

After the officers had completed their search and left Plaintiff's residence, Officer Giberson spoke to an Assistant Commonwealth Attorney about Plaintiff's conduct during the search.  Based on his conversation with that office, Giberson applied for and obtained an arrest warrant for Plaintiff for terroristic threatening, a violation of K.R.S. § 508.080, a Class A misdemeanor.  Although neither the warrant nor affidavit in support thereof are part of the record, it is undisputed that a Kenton County District Judge signed the warrant and Plaintiff was arrested pursuant to that warrant later that same evening.

On October 15, 2004, a grand jury indicted Plaintiff on the terroristic threatening charge, but the charge was ultimately withdrawn after the prosecutor determined that the misdemeanor indictment elements did not meet the crime.

By prior Memorandum Order (Doc. # 27), the Court granted Defendants' Ludlow Independent Schools and Grause's motion to dismiss Plaintiff's 42 U.S.C. § 1981 claims against them, as well as Plaintiff's state law tort claims against them in their official capacities.  Their motion was denied in all other respects. (*Id.*)  Plaintiff thereafter sought leave to amend his Complaint to assert a claim under 42 U.S.C. § 1985(3).  In a separate

10

Memorandum Order, the Court denied Plaintiff's request for leave to amend his Complaint to assert a claim under 42 U.S.C. § 1985(3) based upon his sexual orientation and HIV status (Doc. # 39). However, Plaintiff's request for leave to amend his Complaint to assert a claim under 42 U.S.C. § 1985(3) based upon his status as an opponent of the school tax levy was granted. (*Id.*)

### III.    Analysis

### A.    Summary Judgment Standard

The proper standard for entry of summary judgment is well known. Federal Rule of Civil Procedure 56(c) provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989). Essentially, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up" on a critical issue. *Id.*

Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere presence of a scintilla of evidence in support of

11

the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.  Summary judgment is properly granted if the party who would bear the ultimate burden of proof at trial fails to establish an essential element of the claim.  *See Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995).  If the evidence is insufficient to reasonably support a jury verdict in the nonmoving party's favor, the motion for summary judgment will be granted.  *Street*, 886 F.2d at 1477.

### B.    Official Capacity Claims

In addition to suing Defendants Grause, Tucker, Johnson, Murphy, and Schutzman in their individual capacities, Plaintiff also sues them in their official capacities.   An individual sued in his official capacity is, in actuality, a suit against the government entity itself.  *United Food & Commercial Workers Local 1099 v. City of Sidney,* 364 F.3d 738, 752 (6th Cir. 2004); *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1245 (6th Cir. 1989), *cert. denied,* 495 U.S. 932 (1990).  As a result, Plaintiff's claims against Defendants in their official capacities are the same as claims against the City of Ludlow or the Ludlow Independent School District (LISD).  Thus, a successful suit against a municipal officer in his or her official capacity must meet the requirements for municipal liability stated in *Monell v. Department of Social Servs.,* 436 U.S. 658, 690-91 (1978).

For this reason, Plaintiff's claims against Defendants Grause, Tucker, Johnson, Murphy, and Schutzman in their official capacities must be dismissed as a matter of law and considered to be one and the same as the claims asserted against the City of Ludlow or the LISD.

### C.     Municipal Liability of the City of Ludlow or LISD

An action under 42 U.S.C. § 1983 does not impose vicarious liability upon a municipality for the constitutional torts of its employees.  *Monell,* 436 U.S. at 692.  Rather, it is well-settled that municipal liability under section 1983 is limited to deprivations of federally protected rights caused by action taken pursuant to official municipal policy.  *Id.* at 691; *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997), *cert. denied*, *City of Florence v. Chipman*, 523 U.S. 1118 (1998).  Thus, in order to support a § 1983 claim against either the City of Ludlow or LISD, Plaintiff must prove that: (1) the City or LISD deprived Plaintiff of a constitutional or federal statutory right; <u>and</u> (2) the City or LISD employed a policy, custom, or practice that was deliberately indifferent to Plaintiff's rights and causally related to the constitutional wrong suffered by him.  *Monell*, 436 U.S. at 690-91; *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

In this case, the governmental policy or custom that Plaintiff claims caused his constitutional deprivations is the City of Ludlow's failure to adequately train its police force (Doc. # 71 at p. 22).  In *Harris*, the Supreme Court held that a city's failure to train its police officers can give rise to a constitutional violation only when that failure amounts to deliberate indifference to the rights of persons with whom the police come into contact.  However, a claim of failure to supervise or properly train under section 1983 cannot be based on simple negligence.  *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).  "At a minimum a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending [employees]." *Id.* (citation omitted).  [D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious

consequence of his action.' " *Perez v. Oakland Cty.,* 466 F.3d 416, 430-31 (6th Cir. 2006) (quoting *Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 410 (1997) (internal quotation marks omitted)).  Although it is possible that "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability," *Brown,* 520 U.S. at 409 (1997), "[a]llegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training." *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 904 (6th Cir. 1998)

In his response, Plaintiff boldly states that "if it was city policy to allow Defendant Grause to put up signs, it should be city policy to allow Mr. Lucas to talk to the businesses into taking down the signs."  (Doc. # 71 at 22).  However, there is no evidence of any policy, express or implied, for officers to deprive Plaintiff of his rights to protest the proposed tax levy.  The record reflects that it was the local business owners, rather than city officials, who allowed Grause to post signs and/or fliers supporting the proposed tax levy in their stores.  Plaintiff's reliance on the general allegation that the City of Ludlow did not adequately train its officers, or on articles in the local newspaper to establish a custom or policy by Ludlow officials is woefully inadequate and utterly insufficient.  Additionally, Plaintiff has not demonstrated that any particular training deficiency existed, or that the need for more or different training was so obvious that officials could be said to be deliberately indifferent to the need.

Simply put, Plaintiff has not carried his burden with respect to municipal liability. Plaintiff's statement that a policy existed allowing Grause to post signs while at the same

time depriving him of his rights to protest does not equate to a custom or practice.  To conclude otherwise would make the municipal liability requirement of a custom or practice illusory.  Additionally, Chief Murphy's directive to him at the police station to refrain from removing signs in the manner in which he had been removing them is insufficient as a matter of law to establish a custom or policy.  Because there is insufficient evidence to create a jury question of whether the City of Ludlow or LISD had in place a policy or custom of condoning the deprivation of Plaintiff's ability to exercise his constitutional rights to protest the proposed tax levy, the City of Ludlow and LISD are entitled to summary judgment on Plaintiff's 42 U.S.C. § 1983 claims against it.

Additionally, and as more fully analyzed below, because Plaintiff has failed to survive summary judgment on his section 1983 claims alleging a deprivation of his constitutional rights, the City of Ludlow and LISD are entitled to summary judgment on that basis as well.

**D.    Plaintiff's § 1983 Claims versus Defendants in their individual capacities**

**1.    Introduction**

Under section 1983, a person who, under color of state law, subjects another person to a deprivation of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States, is liable to the party so injured.  42 U.S.C. § 1983.  In order to sustain a claim under § 1983, a plaintiff must identify a right secured by the United States Constitution and a deprivation of that right by a person acting under color of law.  *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir. 1992).

When seeking to impose liability on an individual for an alleged deprivation of someone else's constitutional rights, it is well-settled that such liability cannot be premised

on a theory of respondeat superior.  *McQueen v.. Beecher Community Schools*, 433 F.3d 460, 470 (6th Cir. 2006); *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1246 (1989). Rather, in order for Defendants to be held liable in their individual capacities, Plaintiff must demonstrate that each Defendant personally condoned, encouraged, or participated in the conduct that allegedly violated his rights.  *Birrell v. Brown,* 867 F.2d 956, 959 (6th Cir. 1989) (citations omitted). *See also, Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984)

### 2.    Alleged Deprivation of Plaintiff's Constitutional Rights[8]

Plaintiff alleges that the Defendants violated his clearly recognized First Amendment right to be free from retaliation for exercising his right to protest the proposed tax levy and his Fourth Amendment right to be arrested without a showing of probable cause.  Plaintiff also alleges that Defendants violated his Fourteenth Amendment right to equal protection based on his lifestyle as a homosexual.

### A.    First Amendment

Plaintiff alleges that Defendants Grause, Tucker, Johnson, and Murphy violated his First Amendment right to protest the proposed tax levy by jointly precluding him from expressing his political views throughout Ludlow in the days leading up to the special election on March 30, 2004.  More specifically, Plaintiff alleges that Defendant Grause and two other women "accosted" him in the parking lot of a local Ameristop food mart after he

---

[8]    Although Plaintiff originally raised an Eighth Amendment challenge, by failing to specifically respond to Defendants' arguments on that claim, it has been abandoned.  *See Larimore v. Grant,* No. 3:03CV664-S, Slip Copy, 2006 WL 2037390, n. 3 (W.D.Ky. July 17, 2006) (declaring claim abandoned where the plaintiff failed to address the claim in brief in opposition to defendant's motion for summary judgment, but addressed other claims). *See also, Bradley v. Mary Rutan Hosp. Assoc.,* 322 F.Supp.2d 926, 931 n. 7 (S.D.Ohio 2004); *Kattar v. Three Rivers Area Hosp. Auth.,* 52 F.Supp.2d 789, 798 n. 7 (W.D.Mich.1999).

had admittedly removed a sign supporting the tax levy.  Plaintiff further alleges that Chief Murphy violated his constitutional rights by telling Plaintiff not to take down any more signs.

At the time of Defendants' allegedly retaliatory conduct, the law was clearly established that retaliation for the exercise of free speech was a constitutional violation and could serve as the basis for an action under 42 U.S.C. § 1983.  *Walje v. City of Winchester*, 773 F.2d 729, 732 (6th Cir. 1985).  As the Sixth Circuit has stated, "[t]he law is well settled ... that retaliation under color of law for the exercise of First Amendment rights is unconstitutional...." *Zilich v. Longo,* 34 F.3d 359, 365 (6th Cir. 1994) (holding that threats of physical violence in retaliation for plaintiff's criticism of mayor violated plaintiff's right to free speech).

The elements of a retaliation claim are well-established and require Plaintiff to establish the following elements: "(1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

In this case, it is undisputed that in the days leading up to the special election, Defendant Grause was actively seeking the support of local business owners so they would permit her to place signs supporting the tax levy in their businesses.  It is further undisputed that Plaintiff was campaigning just as vigorously in opposition to the tax levy.  Discovery has revealed that on March 19, 2004, Grause observed that several of the signs that business owners had agreed to place in their windows had been removed after being on

17

display for only a few minutes.  Plaintiff has admitted to following Grause around that day in an attempt to ask business owners if they would remove the signs from their stores. After seeing that some of the signs had been removed, Grause investigated and was advised by the owner of one of the businesses, the Little Corner Kitchen, that a man had come in, told her she would lose business and be the subject of a boycott if she continued to display the sign, gave her three dollars and removed the sign.  Upon learning this, Grause reported the incident to the Ludlow Police Department.

For the reasons that follow, the March 19, 2004 incident at the Ludlow Ameristop food mart involving Grause is not actionable under the First Amendment.[9]  Discovery has established that Plaintiff admitted to removing signs at local businesses in an effort to defeat the tax levy.  Although Grause has admitted to confronting Plaintiff in the parking lot and having the police called to investigate Plaintiff's conduct, such actions fall woefully short of that necessary for a reasonable juror to conclude that she violated his First Amendment rights to be free from retaliation due to his opposition to the tax levy.

Plaintiff's right to protest the tax levy by boycotting businesses who post signs supporting the tax levy is certainly a recognized constitutional right Plaintiff enjoys. Similarly, Plaintiff has an absolute right to attempt to <u>lawfully</u> persuade others to oppose the tax.  That right includes distributing fliers throughout Ludlow in opposition to the tax levy.  However, that right does not include efforts by Plaintiff to remove signs without permission, or provide money, albeit small amounts, to business owners to convince them to allow him to remove signs.  Although the free exchange of ideas has been jealously

---

[9]  Plaintiff's alleged Fourth Amendment claim arising out of this same incident will be addressed in section III(D)(2)(B) of this Memorandum Opinion and Order.

18

guarded throughout constitutional jurisprudence, individuals cannot hide behind the banner of the First Amendment when their conduct is suspected of violating the law.

In this case, just as Plaintiff had every right to campaign against the tax levy, Grause had every right to ensure that the signs she had placed in local business with their permission had been removed lawfully.  That would include calling the police to investigate. This conduct, even viewed in the light most favorable to the Plaintiff, does not give rise to a constitutional violation.  Because Plaintiff has failed to show that he was engaged in a constitutionally protected activity regarding the removal of the signs, there can be no retaliation claim as a matter of law.

To the extent Plaintiff seeks to hang his First Amendment retaliation claim against Defendant Grause on her written responses to his e-mails to the school staff or other conduct, Plaintiff's effort fails.  Plaintiff freely admitted in his deposition that he had sent an e-mail to school staff requesting that they vote no.  In an effort to promote passage of the tax, Grause communicated with school officials via e-mail and parents via letter.  In those missives, Grause attempted to provide information regarding why the tax was needed and respond to the campaign tactics which had been lodged against the tax.   Her communications with both parents and school staff did not violate Plaintiff's First Amendment rights.  For all of these reasons, Grause is entitled to summary judgment on Plaintiff's First Amendment claim.

Similarly, Chief Murphy's directive to Plaintiff that he should not remove any more signs was a lawful statement and did not deprive Plaintiff of his First Amendment rights. Removing signs placed in local business by someone else is not protected First Amendment conduct.  Plaintiff could have expressed his First Amendment voice by posting

19

fliers in opposition to the tax, and the record reflects that he did so.  Simply put, the conduct of Chief Murphy during the meeting at the police station did not violate Plaintiff's constitutional rights.  Accordingly, Murphy is entitled to summary judgment on Plaintiff's First Amendment claim.

To the extent that Plaintiff alleges a violation of the First Amendment by Officer Tucker as a result of this meeting, the record reflects that while he was present for part of the meeting, Tucker did not participate in the discussion in any way.   Under these circumstances, no reasonable juror could find for Plaintiff on his First Amendment claim against Officer Tucker.  Accordingly, Tucker is entitled to summary judgment on Plaintiff's First Amendment claim.

### B.    Fourth Amendment

It is well established that an arrest without probable cause violates the Fourth Amendment.  *See Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001).  In assessing whether probable cause exists, an officer must consider all facts *within his knowledge*, including such that under state law would constitute an affirmative defense to the crime for which plaintiff is charged.  *Estate of Dietrich v. Burrows,* 167 F.3d 1007, 1012 (6th Cir. 1999).  If an officer has no reason to believe that a complainant is being untruthful or unreliable, the officer may rely upon that information to support probable cause.  *Ahlers v. Schebil,* 188 F.3d 365, 370 (6th Cir. 1989).  An officer has no duty to continue investigating in search of exculpatory information, but if exculpatory information appears in the search for probable cause, it should also be considered.  *Id.* at 371.  However, while police officers cannot ignore exculpatory facts in reaching probable cause determinations, they need not investigate plaintiff's legal defenses prior to making arrest, *Fridley v. Horrighs,* 291 F.3d

867, 874-75 (6th Cir. 2002), nor are they required to give credence to plaintiff's story or alibi or forego arrest pending further investigation if the facts as initially discovered provide probable cause for an arrest.  *Klein,* 275 F.3d at 551-52; *Ahlers,* 188 F.3d at 371.

## Vote-buying Incident

In this case, discovery has revealed that after receiving an e-mail from Defendant Grause on March 22, 2004, indicating that Plaintiff had promised to purchase beer for an eighteen year old high school senior in exchange for that student's vote against the proposed school tax levy, Officer Tucker investigated the incident.  Tucker's investigation included interviewing the student and obtaining written statements from two other witnesses, Rick and Dyana Fox.  Each individual verified the information Tucker received from Grause, to wit, that Plaintiff had offered the student beer in exchange for voting against the tax.  Attempts to interview Plaintiff were unsuccessful.  Tucker also determined that Plaintiff had spoken to several local business owners about the tax issue in a way that one owner perceived as a bribe and that all perceived as threatening or annoying. Although Plaintiff contends that he was only joking when he made the beer for "no-vote" proposal to the student, Tucker had every reason to believe that Plaintiff was serious and that he was not joking as he now claims.  Under these circumstances, Tucker had probable cause to support his application for a warrant to arrest Plaintiff.

In this case, Officer Tucker was under no obligation to investigate further or accept Plaintiff's exculpatory version of events.  Probable cause is not negated simply by a plaintiff's plausible exculpatory explanation. *Ahlers*, 188 F.3d at 371. "Once probable cause is established, an officer is under no duty to investigate further or to look for additional

evidence which may exculpate the accused." *Id.*  In that regard, Plaintiff's reliance on written statements, obtained later, from others who witnessed the incident is misplaced.

Additionally, the probable cause determination herein was submitted to Judge Grothaus for approval.  Upon reviewing the affidavit, Judge Grothaus agreed that it was supported by probable cause and authorized the issuance of an arrest warrant for a violation of K.R.S. § 119.205.[10]  There is no evidence to support a conclusion that Tucker knew, or even suspected, any of the information he included in his warrant application to be false.

Plaintiff seeks to impose obligations upon the officers herein not required by the legal standards of *Klein* and *Ahlers.*  Despite Plaintiff's argument to the contrary, based on the facts known to Officer Tucker at the time he sought an arrest warrant for the vote-buying incident, Tucker had no legal duty to verify Plaintiff's version of the Grogan vote-buying incident prior to seeking the arrest warrant.  Plaintiff has pointed to no reason or evidence of why Officer Tucker should have suspected the information was untrustworthy at the time he submitted his affidavit to Judge Grothaus.

In view of Plaintiff's admission that he did offer to purchase the student a 12-pack of beer in exchange for voting against the tax, Plaintiff's suggestion that Officer Tucker should have doubted the veracity of the student's version of events is unreasonable.

---

[10] K.R.S. § 119.205 provides:
(1) Any person who makes or offers to make an expenditure to any person to vote for or against any public question at an election shall be guilty of a felony.
* * *
(4) For purposes of this section, "expenditure" means any of the following when intended as payment or consideration for voting for or against any public question :
(a) A payment or gift of money or anything of value; or
(b) A contract, promise, or agreement, express or implied, whether or not legally enforceable, to make a payment or gift of money or anything of value.

22

Although Plaintiff has submitted statements from other witnesses who were of the belief that he was joking when he made the beer for "no-vote" offer, those statements were not known to Officer Tucker at the time.  Because Tucker had no specific reason to doubt the information he received from the student or the Foxes, no further investigation was required.  Although Tucker did make an effort to speak with Plaintiff prior to obtaining the arrest warrant, he was under no legal obligation to do so.  Since Tucker had no reason to question the veracity of the information he had obtained, his failure to interview other witnesses or seek further corroboration is not actionable.

In this case, Officer Tucker was under no obligation to investigate further or accept Plaintiff's version that he was merely joking.  Probable cause is not negated simply by a defendant's provision of a plausible exculpatory explanation.  *Ahlers,* 188 F.3d at 371. "Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Id.*  Simply put, Plaintiff's argument of a duty to investigate is unavailing primarily for the reason that once probable cause exists, officers are not required to delay an arrest or at every turn to reassess their probable cause determination, whether faced with the discovery of some new evidence or with a suspect's self-exonerating explanation. *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988) ("A policeman...is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause."); *Thompson v. Olson*, 798 F.2d 552, 556 (1st Cir. 1986); *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979) ("[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of

innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.").  Once an officer has probable cause, the officer is under no obligation to continue investigating and may, instead, pursue the arrest of the suspect. *Crockett v. Cumberland College*, 316 F.3d 571, 581, 583 (6th Cir. 2003); *see also Romero v. Fay*, 45 F.3d 1472, 1478 (10th Cir. 1995) ("failure to question [plaintiff's] alibi witness prior to arrest did not negate probable cause").  Under these circumstances, Officer Tucker is entitled to summary judgment on Plaintiff's Fourth Amendment claim.

Plaintiff's claims against Officer Johnson stemming from his alleged effectuation of Plaintiff's arrest on March 25, 2004 suffer from the same deficiencies as those against Officer Tucker.  First, as explained herein, probable cause existed for the issuance of the arrest warrant.  Second, Plaintiff was arrested pursuant to the warrant by Ludlow Police Officer Giberson, rather than Officer Johnson.  Although Officer Johnson was admittedly present when Plaintiff was arrested, Plaintiff has alleged no impropriety by Johnson stemming from his March 25, 2004 arrest.  Under these circumstances, Officer Johnson is entitled to summary judgment on Plaintiff's Fourth Amendment claim.

Plaintiff's claims against Chief Murphy stemming from the investigation of and arrest for the vote-buying incident also fail to survive summary judgment.  Other than instructing Officer Tucker to investigate the vote-buying allegations, the record is devoid of any evidence that Chief Murphy was directly involved in either the investigation or the arrest. The cases dealing with imposing individual liability upon an official not directly involved in the alleged unconstitutional conduct have generally involved the concept of supervisory liability.  In this context, the cases note that generally officials are held personally responsible only for their own unconstitutional actions, rather than a "mere failure to act."

*Leach v. Shelby Co. Sheriff,* 891 F.2d 1241, 1246 (6th Cir. 1990).  An official can be held liable for failure to supervise and control subordinates only where he "either encouraged the specific incident of misconduct or in some other way directly participated in it."  *Hicks v. Frey,* 992 F.2d 1450, 1455 (6th Cir. 1993).  At a minimum therefore, a § 1983 plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.  *Id.*

As previously stated herein, Chief Murphy was not personally involved in any of the alleged constitutional improprieties surrounding the attempted vote-buying incident.  His position as police chief is insufficient, in the absence of any proof in the record, to hold him accountable under a supervisory liability theory.  Regardless, the Court has already determined above that Officers Tucker and Johnson's conduct did not give rise to constitutional deprivations.  Therefore, there was no misconduct which Chief Murphy failed to supervise or control.  Accordingly, Plaintiff's claims against Chief Murphy in his individual capacity stemming from the vote-buying incident will also be dismissed.

Viewing the evidence in light most favorably to Plaintiff, his Fourth Amendment claims against Defendant Grause also fail to survive summary judgment.  Plaintiff's Fourth Amendment claim against Grause involves two incidents.  First, the March 19, 2004 conduct wherein she admittedly confronted Plaintiff in the Ameristop food mart parking lot about his removal of signs supporting the proposed tax and her purported "detention" of him while police were called, and second, her March 22, 2004 forwarding to Defendant Tucker of an e-mail she received from a teacher regarding a possible vote buying incident.

As school superintendent, Grause was certainly within her rights to forward the e-mail she had received from a teacher to Officer Tucker, the school's resource officer.

Despite Plaintiff's continued assertion that he was only joking, Grause had no information at the time she received the e-mail that Plaintiff's comment to the student was made in jest. Grause only knew that a Ludlow high school student may have been involved in an incident that may have violated the law.  Additionally, the fact that the e-mail mentioned that the individual was the same person who had removed the signs does not alter the Court's analysis.  Plaintiff's First Amendment right to protest the tax does not give him free reign to attempt to buy votes by agreeing to purchase beer for underage students.

Moreover, the Court's decision to grant Defendant Grause summary judgment on Plaintiff's Fourth Amendment claim is further supported by the fact that it is undisputed that once the e-mail was forwarded to Tucker, Grause's involvement in the investigation ceased.  It was Tucker, not Grause, who, after consultation with the County Attorney's Office, made the decision to approach Judge Grothaus and obtain an arrest warrant for attempted vote buying.  The act of forwarding the information (i.e. the e-mail) to the proper authorities for investigation does not even approach a constitutional deprivation cognizable under the Fourth Amendment, especially given the fact that Plaintiff admitted that he had made the beer for "no-vote" offer to the student.

### Ameristop Sign Incident

It is undisputed that upon observing Plaintiff exiting the Ludlow Ameristop on March 19, 2004 with one of the pro-tax signs, Defendant Grause confronted him about the sign, while another individual called the police.  The police arrived a short time later to investigate.  Plaintiff alleges he was unlawfully detained at Ameristop by Grause until the police arrived, in violation of his Fourth Amendment rights.

26

Upon arriving at Ameristop, the responding officers interviewed the store clerk who advised that Plaintiff had come in and told him that a lot of people would be upset if he left the signs up and might not come in the store.  Although Plaintiff claims he had the permission of the owner to remove the signs, according to the store clerk, Plaintiff did not have permission.  The clerk advised the officers that he told Plaintiff he would consider removing the signs.  However, Plaintiff removed the signs with him when he exited the store.  Plaintiff also spoke with the responding officers.  During their conversation, Plaintiff requested to speak with Chief Murphy.  It is undisputed that Plaintiff thereafter drove himself to the police station to discuss the incident with Chief Murphy.[11]   It is further undisputed that Grause did not accompany Plaintiff to the police station.  After their meeting, Chief Murphy instructed Plaintiff not to take down any more signs before allowing Plaintiff to leave.

The Fourth Amendment requires that all seizures be based upon probable cause. There are, however, certain "narrowly drawn exceptions" to the probable cause requirement, including the investigatory detention, or *Terry* stop.  *United States v. Garza,* 10 F.3d 1241, 1245 (6th Cir. 1993).  A lawful *Terry* stop requires that the authorities be able to point to "specific and articulable facts" justifying their reasonable suspicion that the suspect has been or is about to be involved in criminal activity.  *Id.* (citations omitted). Whereas an arrest must be based on probable cause, an investigative or *Terry*-type stop may be based on an officer's "reasonable suspicion."  *United States v. Hardnett,* 804 F.2d

---

[11]  Plaintiff alleges that he was followed in front and behind by officers, who "escorted" him to the police station.

353, 356 (6th Cir. 1986) (quoting *Terry,* 392 U.S. at 21-22), *cert. denied,* 479 U.S. 1097 (1987).

The court's inquiry into the legitimacy of an investigatory stop involves a two-pronged examination of its reasonableness. First, the court should determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion." *Garza,* 10 F.3d at 1245 (citation omitted). Second, the court should decide "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.*

For purposes of analyzing Plaintiff's Fourth Amendment claim arising out of the Ameristop sign incident, the Court will assume that Plaintiff was detained at the point in time when the responding officers arrived to investigate. Even if the detention occurred moments earlier, as alleged by Plaintiff, there was sufficient reasonable suspicion at that point to permit a brief investigative detention. Prior to confronting Plaintiff in the parking lot, Grause learned that Plaintiff had made statements to the owner of another local business that he would lose business and be boycotted if she continued to display the pro-tax sign. Grause had also learned that Plaintiff gave the owner three dollars and removed the sign from that store.

After interviewing the Ameristop store clerk, the officers had reasonable suspicion that Plaintiff had been removing signs which did not belong to him and were therefore authorized to briefly detain him to investigate. Based on their interview of the store clerk, and the information they had learned from Grause, there was sufficient question in the

28

officers' minds as to whether Plaintiff had actually been given permission to remove the signs or if he removed them without permission.  If Plaintiff had removed the signs without permission of the store owner, he may have been subject to prosecution for theft by unlawful taking or disposition, a Class A misdemeanor.[12]  Under these facts, the officers were justified in detaining Plaintiff for further investigation.  Because Plaintiff told the officers he wanted to speak to Chief Murphy about the incident, the investigation moved to the Ludlow Police Department.

Having concluded there was a proper basis for the brief investigatory detention, the court next must determine whether the degree of intrusion into Plaintiff's personal security was reasonably related in scope to the situation at hand.  In this instance, the Court concludes that it was.  First and foremost, it was Plaintiff who requested a meeting with Chief Murphy, which necessitated him going to the police station.  Plaintiff can hardly protest the length of the detention when it was he who requested to speak with the police chief.  By all accounts the meeting at the police station was brief, and ended with Chief Murphy telling Plaintiff to not remove any more signs.

Under these facts, no reasonable jury could find that Plaintiff's Fourth Amendment rights were violated by Grause of any other Defendant by virtue of his brief investigatory detention at the Ameristop parking lot or the police station.  Therefore, Defendants are entitled to summary judgment on Plaintiff's Fourth Amendment claim arising out of the Ameristop sign incident.

---

[12]   K.R.S. § 514.030(1)(a) provides, in relevant part, that "a person is guilty of theft by unlawful taking or disposition when he unlawfully takes or exercises control over movable property of another with intent to deprive him thereof."

### Terroristic Threatening Incident

Plaintiff alleges that Officer Johnson is liable under the Fourth Amendment for having charged Plaintiff with terroristic threatening, knowing that such a charge was not supported by probable cause.  Plaintiff points nefariously to the fact that rather than arrest him on the spot for his conduct, the officers waited until hours later when they apparently were able to trump up charges.

Despite Plaintiff's attempts to downplay the significance of a state court judge's finding of probable cause that a warrant be issued for terroristic threatening, the fact remains that Officer Giberson, rather than Officer Johnson, presented an affidavit to a state court judge, who made a probable cause finding.  Moreover, unlike the situation with the March, 2004 vote-buying incident, a grand jury returned an indictment on October 15, 2004 charging Plaintiff with the misdemeanor offense of terroristic threatening in violation of K.R.S. § 508.080.  Based on this probable cause finding, Defendants argue that Plaintiff should be precluded from relitigating that issue.  Although the Court recognizes that issues decided in state court criminal proceedings may preclude relitigation of the same issues in a subsequent action brought in federal court under 42 U.S.C. § 1983, *see Allen v. McCurry,* 449 U.S. 90, 94-96 (1980), because that charge was ultimately withdrawn after the state prosecutor determined that the misdemeanor indictment elements did not meet the crime, the Court will not rely upon the grand jury's finding of probable cause  to preclude Plaintiff from arguing otherwise.

In any event, Plaintiff's Fourth Amendment claim against Defendant Johnson based on his July 23, 2004 arrest fails because there was probable cause to arrest him on that date for terroristic threatening.  Plaintiff has admitted that during the execution of the search

30

warrant, he told Officer Johnson that he knew where he lived and intimated that he would plant drugs in Johnson's home, on Johnson's daughters or in their vehicles.  Plaintiff also threatened to have Johnson's house searched for drugs.  In addition, Plaintiff said he knew where Johnson lived in a manner and under circumstances that implied he intended to visit Johnson's home with the intention of harming Johnson or Johnson's daughters.  Although Plaintiff now claims he was just joking when he made those or similar comments, the comments establish probable cause that Plaintiff violated K.R.S. § 508.080.

As pointed out by Defendants in their motion, planting drugs in Johnson's house would have required Plaintiff to enter Johnson's home without permission, constituting criminal trespass, which would violate K.R.S. § 511.060.  Additionally, planting drugs in Johnson's home or in his daughters' vehicles would have constituted criminal littering, which occurs when someone knowingly places or throws litter on any private property without permission.  K.R.S. § 512.070.  Planting drugs anywhere and then reporting to the DEA that Johnson and/or his daughters were in possession of drugs in order to cause the DEA to search Johnson's home or his daughters' vehicles would constitute false reporting, in violation of K.R.S. § 519.040.  Additionally, harming Johnson or a member of Johnson's family would constitute assault, in violation of K.R.S. § 508.030.  Any of these crimes would likely result in death, serious physical injury or substantial property damage. Plaintiff would have to break into or forcibly enter Johnson's house or his daughters' vehicles to get the access necessary to plant drugs therein.  In order to plant drugs on Johnson's daughters, Plaintiff would have to physically confront them. At the very least, such conduct would involve substantial property damage, and could likely involve a physical confrontation

resulting in serious physical injury to Johnson or a member of his family.  For these reasons, there was probable cause to arrest Plaintiff for terroristic threatening as a result of his conduct on July 23, 2004.  The state court judge agreed, and signed off on an arrest warrant.

Plaintiff's argument that the officers should have arrested him immediately rather than waiting to obtain an arrest warrant is a classic red herring.  The fact that Officer Giberson chose to present an affidavit to a judge, rather than make a warrantless arrest, shows that he acted with prudence and caution, rather than for some unspecified nefarious reason as intimated by Plaintiff.

Based on the undisputed facts herein, a reasonable jury could not conclude that there was not probable cause to arrest Plaintiff for the terroristic threatening charge. Accordingly, Officer Johnson is entitled to summary judgment on Plaintiff's Fourth Amendment claim arising out of the terroristic threatening incident.

One final comment deserves brief discussion.  Although Plaintiff repeatedly argues that Officer Johnson made sexually derogatory remarks to him while executing the search warrant, those remarks do not give rise to a constitutional violation in this setting.  Even assuming Johnson uttered the homophobic remarks as espoused by Plaintiff, those remarks simply have nothing to do with a finding of probable cause.  For these reasons, Plaintiff's attempts to paint Officer Johnson as homophobic bigot are irrelevant for purposes of his Fourth Amendment claim.

## C. **Fourteenth Amendment**

Plaintiff asserts that he was treated differently by the Ludlow police department due to his sexual orientation.  According to Plaintiff, although he complained to the police about

the conduct of his neighbors, they merely paid his complaints lip service and did not investigate his complaints with the same vigor as they did with the complaints of his neighbors against him.  More specifically, Plaintiff alleges that when he complained that the Rices threatened him with a baseball bat, the police did a cursory investigation, which lead only to a verbal reprimand.  However, when the Rices or Ms. Padgett claimed they had observed him with a gun, the police believed their story without much corroboration and obtained a search warrant for his residence on Oak Street.  Plaintiff further alleges that he was subject to disparate treatment because he was arrested for a terroristic threatening charge when his conduct was far less egregious than the Rices' conduct.

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to any person within its jurisdiction the equal protection of the laws.  U.S. CONST. Am. XIV, § 1.  The Equal Protection Clause generally requires that "all persons similarly situated should be treated alike."  *Cutshall v. Sundquist*, 193 F.3d 466, 482 (6th Cir. 1999) (quoting *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)).  The guarantee of equal protection is not itself a source of substantive rights, but rather it is "a right to be free from invidious discrimination in statutory classifications and other governmental activity."  *Harris v. McRae*, 448 U.S. 297, 322 (1980).  To prevail on a § 1983 action for a violation of equal protection, Plaintiff must show intentional discrimination because of membership in a particular class or group singled out for discriminatory treatment, not merely that it was treated unfairly from an individual perspective.  *See Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986); *Williams v. Bramer,* 180 F.3d 699, 705 (5th Cir. 1999) ("To state a claim under the Equal Protection Clause, a § 1983 plaintiff must

33

allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class.").

In this case, because there is no evidence that Plaintiff was treated differently by the Defendants for similarly situated conduct, his equal protection claim fails as a matter of law. First, it is undisputed that the baseball bat incident referenced in Plaintiff's response was not observed by the police. Rather, the parties disagree as to what occurred. The July 23, 2004 conduct which ultimately gave rise to the terroristic threatening charge was observed by multiple officers who were executing the search warrant at Plaintiff's residence. In fact, Plaintiff admits to telling Officer Johnson that he knew where he lived, he was going to set him or his daughters up by planting drugs on them or in their vehicles. That admitted conduct was observed by multiple officers. Simply put, Plaintiff and the Rices are not similarly situated.

Second, and just as importantly, even if they were similarly situated, there is no evidence the disparate treatment was due to Plaintiff's sexual orientation. Despite Plaintiff's conclusory argument to the contrary, there is no evidence that would allow a reasonable jury to conclude that a heterosexual who behaved in the same manner as Plaintiff or who presented the same complaints to Ludlow officials would have been treated more favorably than Plaintiff was treated. In this case, it is undisputed that the police was aware of an ongoing feud between Plaintiff and some of his neighbors. Whether Plaintiff was the complainant or was accused of some wrongdoing by others, it is clear from the record that he was frequently involved in disputes with his neighbors, some more serious than others. Because Plaintiff has failed to adduce any evidence that he was treated disparately by any of the named Defendants, or that the Defendants' treatment of him was

34

not motivated by a legitimate government objective, Defendants are entitled to summary judgment on Plaintiff's Fourteenth Amendment equal protection claim.

### 3.  Constitutional Claims versus Defendant Schutzman

Plaintiff's allegations against Defendant Schutzman warrant little discussion. Although named as a Defendant in his individual capacity as the Building and Zoning Administrator for the City of Ludlow, Plaintiff has failed to specify the constitution deprivation he suffered at the hands of Schutzman.  Rather, he spends slightly more than one-half page in his response asserting an unspecified constitutional violation.   In a nutshell, Plaintiff's purported constitution claim against Schutzman surrounds his requiring a land survey to be prepared when a survey was not necessary.

Even assuming Plaintiff's allegations against Schutzman as proffered were true, they do not even approach any constitutional violation, under any theory, specified or unspecified.

### No need to address qualified immunity arguments

One final matter deserves brief comment.  Although the parties spend an inordinate amount of time in their pleadings arguing in favor of, or against qualified immunity, because the Court has found no constitutional violations, the Court need not reach the issue of qualified immunity.

### E.    Plaintiff's § 1985(3) Conspiracy Claims

It is well-settled that Section 1985(3)[13] creates a cause of action for conspiracy to violate an individual's civil rights.  To succeed in establishing a § 1985(3) claim, a plaintiff must demonstrate "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."  *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007) (citations omitted).  A § 1985(3) complaint must "allege both a conspiracy and some class-based discriminatory animus behind the conspirators' action." *Newell v. Brown,* 981 F.2d 880, 886 (6th Cir. 1992).  Further, "conspiracy claims must be pled with some degree of specificity and ... vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Gutierrez v. Lynch,* 826 F.2d 1534, 1538-39 (6th Cir. 1987).

In this case, the Court has limited Plaintiff's § 1985(3) claim to one based on his opposition to the proposed tax levy.  Plaintiff's request to amend his complaint to assert a claim under § 1985(3) based on his sexual orientation was previously denied  (Doc. # 39

---

[13]  Section 1985(3) provides that:
[i]f two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.  42 U.S.C. § 1985(3) (2000)

at 6).  Therefore, Plaintiff's reliance on any actions by the Defendants wherein they reference his sexual orientation to establish his § 1985(3) claim is misplaced.

Plaintiff alleges that his § 1985(3) conspiracy claim should survive summary judgment because the record contains sufficient evidence from which a reasonable jury could conclude a conspiracy to deprive him of his right to protest the tax levy existed between the Grause and members of the Ludlow Police Department, namely Officer Tucker.  In support of his claim, Plaintiff points to the e-mail between Grause and Tucker alerting him of the possible vote-buying incident, Grause's e-mail to other school officials and letter to parents which Plaintiff believes shows she had inside information regarding Tucker's investigation, the fact that Tucker, as the school's resource officer, exceeded his role by investigating the alleged off-site vote-buying incident, the fact that Tucker's investigation was designed to assist in passage of the tax levy, which would ultimately lead to additional monies and revenues for Tucker, meetings at a local Bob Evans restaurant between Grause and/or Defendants Murphy, Tucker, Johnson, and Schutzman, and the fact that Johnson, due to his position with the police department, had to be aware of the conspiracy.

The fact that Grause reported what she believed to be a crime to Officer Tucker and that Tucker investigated the factual basis of Grause's allegation does not establish that they agreed to discourage Plaintiff from speaking out about the tax.  Nor does the fact that the e-mail states that that same person had removed signs supporting the tax prove a conspiratorial objective between Grause and Tucker.  In each instance, Plaintiff cannot dispute, and in fact has admitted to both actions.

Moreover, even if the Court were to assume that Tucker's investigation into the vote-buying incident was somehow incomplete or that Plaintiff's arrest was without probable cause, the record is still insufficient to establish a conspiratorial agreement between Grause and Tucker.   In *Ahlers*, the plaintiff alleged a conspiracy on a similar basis as Plaintiff herein.   In rejecting the conspiracy claim, the Sixth Circuit held that an allegedly imperfect investigation was insufficient proof of a civil conspiracy.   Alleging that the investigation was incompetent, however, does not put forth any genuine issues of fact that there was an agreement or plot between Parsons and the Washtenaw County Defendants to arrest and charge Ahlers with a crime he did not commit.   Thus, Plaintiffs have failed to allege facts which would state a claim for civil conspiracy.

Moreover, the fact that Grause communicated to school officials via e-mail and parents via letter regarding the efforts of Plaintiff and others to defeat the tax levy does not rise to the level of a conspiratorial act under § 1985(3).   In both missives, Grause was merely reporting tactics which Plaintiff has admitted committing, albeit with a differing spin, to wit, he was merely joking.   Although Plaintiff alleges that Grause spearheaded the investigation and prosecution of him for the vote-buying incident, the record proves otherwise.   Plaintiff's version of events is simply belied by the record, and no reasonable jury could find otherwise.

The events surrounding the Ameristop incident are also insufficient to establish a conspiracy.   As with the alleged vote-buying incident, Plaintiff has admitted to removing signs from local businesses, and on at least one occasion, provided a small amount of money to the owner of the business to allow him to remove the sign.   While Plaintiff's intent

38

is disputed, the facts are not.  The actions by Grause of having the police investigate Plaintiff's conduct is simply insufficient to establish a conspiracy in this case.

Furthermore, because the meetings between Grause and other Defendants occurred well after the tax levy vote of March 30, 2004, or the conclusion of the criminal case against him on May 28, 2004, anything said during those meetings cannot form the basis of acts in furtherance of any conspiracy.  Since the tax levy had already been soundly defeated, the purpose of the alleged meetings could not have been to form some conspiratorial plan to prevent Plaintiff from opposing the tax.  In addition to the obvious time problems with reliance on anything discussed during these meetings, there is no record evidence from Mr. Bickers or anyone else regarding what was actually discussed.[14]  Finally, although Plaintiff testified that he observed Grause and others speaking with one another near school grounds, he was not privy to what was being discussed.   Under these circumstances, there is no evidence of a conspiracy.  The Defendants' mere presence with one another proves nothing.

The record shows that Defendants did nothing to restrict Plaintiff's First Amendment activities.  Rather, it was only when they were advised that Plaintiff had possibly broken the law by removing signs from local businesses or offering an underage high school senior beer to vote against the tax that they took action against Plaintiff.  Even then, Defendants did not preclude Plaintiff from opposing the tax – they acted only to keep him from buying votes or removing signs which did not belong to him.  Although Plaintiff had a recognized First Amendment right to express his views regarding the tax, he had no right under the

---

[14]  Bickers testified he was not privy to any of the conversations during the meetings.

Constitution or otherwise to offer another voter a gift in exchange for a certain vote, or remove signs from businesses which did not belong to him.

For all of these reasons, the Court finds Plaintiff's proof to be insufficient to state a *prima facie* case of conspiracy against Defendants in their individual capacities. Plaintiff has failed to evidence that a genuine issue exists as to any of the necessary elements of such a claim. Similar to *Smith v. Thornburg,* 136 F.3d 1070 (6th Cir. 1998)*,* there is a total lack of any evidence of a *conspiracy* in this case to deprive Plaintiff of his constitutional rights. Because Plaintiff cannot establish the elements of a claim under §1985(3), the Defendants are entitled to summary judgment on his conspiracy claim.

### F.   Plaintiff's State Law Claims[15]

#### 1.   Malicious Prosecution

It is well-settled that in order to recover for malicious prosecution under Kentucky law, a plaintiff must establish six elements: (1) institution/continuation of judicial proceedings; (2) by, or at the encouragement of, the defendant; (3) the termination of such proceedings in plaintiff's favor; (4) malice in the institution of such proceeding; (5) want or lack of probable cause for the proceeding; and (6) the suffering of damage as a result of the proceeding. *Raine v. Drasin,* 621 S.W.2d 895, 899 (Ky. 1981).

For the reasons previously stated in section III(D)(2)(B) of this Memorandum Opinion and Order, because there was probable cause for both the vote-buying incident and the terroristic threatening charges, as detailed therein, and a reasonable jury could not

---

[15] Although Plaintiff originally raised a false imprisonment claim arising out of the Ameristop parking lot incident, by failing to specifically respond to Defendants' arguments on that claim, he has abandoned that claim. *See* footnote 8 herein.

conclude otherwise, Plaintiff's malicious prosecution claim fails as a matter of law.  Thus, it is unnecessary to specifically address the other elements.

### 2.   <u>Defamation</u>[16]

In order for Plaintiff to state a claim for defamation under Kentucky law, he must show that: 1) a defamatory statement was made; 2) of or concerning him; 3) which was published to a third party; and 4) which caused injury to his reputation.  *Dennison v. Murray State University*, 465 F.Supp.2d 733, 749 (W.D.Ky. 2006).  In Kentucky, truth is a complete defense, thus a defendant able to prove the truth of the statement at issue cannot be held liable for defamation.  *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795-96 (Ky. 2004).

The term "defamatory language" should be broadly construed as language that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977). See also *Ball v. E.W. Scripps Co.,* 801 S.W.2d 684, 688 (Ky. 1990), and *McCall v. Courier-Journal & Louisville Times Co.,* 623 S.W.2d 882 (Ky. 1981).  The terms should be construed in their most natural meaning and should be 'measured by the natural and probable effect on the mind of the average [person].'" *Yancey v. Hamilton,* 786 S.W.2d 854, 858 (Ky. 1989) (quoting *McCall,* 623 S.W.2d at 884). "[W]ords falsely spoken will be defined according to their popular meaning, and as intended to be meant by the speaker and understood by the hearers. And, in arriving at the sense

---

[16]   In his response to Defendants' motions for summary judgment, Plaintiff effectively concedes that he is limiting his defamation action to Defendant Grause.  Because Plaintiff cannot point to any publication attributable to Defendants Tucker, Murphy, Johnson, or Schutzman, they are entitled to summary judgment on his state law defamation claim.

in which the defamatory language is employed, it is proper to consider the circumstances surrounding its publication and the entire language used." *Abbott v. Vinson,* 230 Ky. 786, 20 S.W.2d 995, 996 (1929).  "It is a fundamental principle in the law of libel and slander that the defamatory matter complained of should be construed as a whole, and that the language employed therein should receive its common and ordinary acceptation in the light of the conditions and circumstances under which it was published." *Commercial Tribune Pub. Co. v. Haines,* 228 Ky. 483, 15 S.W.2d 306, 307 (1929).

In support of his defamation claim, Plaintiff relies exclusively on Grause's March 22, 2004 letter, to parents wherein she identified the tactics being used by opponents of the tax levy and explained the reasons why the tax levy was necessary.  That letter, which is attached to Plaintiff's response as an exhibit (*See* Doc. # 71-15), makes no specific reference to Plaintiff by name.  Rather, it describes the tactics being used to defeat the tax, including the actions of an unnamed individual who was removing signs from local businesses and threatening to boycott the businesses if they continue to display signs in favor of the tax.[17]  However, the fact that Plaintiff is not specifically named is not fatal to his

---

[17]  More specifically, the letter stated, in pertinent part:

For our students it is now "the best of times" and " the worst of our times."  It is the best of times because our teachers are working hard to make sure our students are successful on the CATS Assessment in April.  It is the worst of times because a small group of Ludlow citizens is working hard to keep the Growth Nickel from passing on March 30th.  They are working hard to destroy your child's future!

This small group of citizens does not care about Ludlow Schools or your children. They are so against providing support for our schools that they have used intimidation, threats, false information, scare tactics, and bribery!  Over the weekend, an individual went to local business owners and took down signs the school had placed to give citizens accurate information about the Growth Nickel. This individual actually threatened the business owners with a boycott if they displayed this accurate tax information. This same group has sent vicious, untrue e-mails and flyers to homes, and they have been out terrifying renters. They are telling you that your landlord will greatly increase your rent if the Growth Nickel Tax passes on March 30th.  All of these outrageous

defamation claim because under Kentucky law, a plaintiff need not be specifically identified in the defamatory matter itself so long as the plaintiff's friends and acquaintances familiar with the incident could reasonably identify the plaintiff as the person defamed. *Stringer v. Wal-Mart Stores,* 151 S.W.3d 781, 793-94 (Ky. 2005).

However, because Plaintiff has acknowledged that the factual statements in the letter regarding removing the signs and boycotting businesses were accurate, the truth of the statements dictates dismissal of this claim.   While Plaintiff disputes Grause's characterizations within the letter, the letter contains no falsehoods.  During his deposition, Plaintiff has further acknowledged that it would be reasonable for people to view his actions during the tax levy campaign as intimidation, threats, false information, scare tactics, and bribery, the very same nouns used by Grause in her letter.  Construed as a whole, Plaintiff cannot show that the statements in the March 22, 2004 letter were false.  As a result, the Court finds that Plaintiff's claim that the letter is defamatory fails as a matter of law. *See Stringer*, 151 S.W.3d at 795-96.

Accordingly, Grause is entitled to summary judgment on Plaintiff's state law defamation claim.

### IV.    Conclusion

For the reasons discussed herein, **IT IS ORDERED** as follows:

(1)    Defendants' Motions for Summary Judgment (Doc. # 61 and 63) be, and are hereby **GRANTED**.  A separate Judgment for Defendants shall be entered concurrently herewith;

---

statements are untrue and their tactics are improper, if not illegal.  The police have been notified and charges will be filed.

(2)     That this action is hereby **DISMISSED WITH PREJUDICE,** and **STRICKEN**

from the docket of this Court.

This 20th day of September, 2007.



Signed By:

*David L. Bunning*   DB

**United States District Judge**

G:\DATA\Opinions\02-05-52-MOO Granting MSJs.wpd